**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. 23-cr-00070-JB-N** |
| | * | |
| **CRAIG D. PERCIAVALLE** | * | |
| **JOSEPH A. RUNKEL** | * | |
| **WILLIAM O. ADAMS** | * | |

**DEFENDANTS' MOTION TO CONTINUE TRIAL SETTING**

Defendants Craig Perciavalle, Joseph Runkel, and William Adams (collectively referred to as "Defendants") respectfully move for a continuance of the current January 2025 trial setting until October 2025. In support, the Defendants state as follows:

## I.     PROCEDURAL BACKGROUND

1.      An indictment was returned in this action on March 30, 2023, charging Defendants with one count of conspiracy to commit wire fraud and wire fraud affecting a financial institution, five counts of wire fraud, and two counts of wire fraud affecting a financial institution, all arising from an alleged scheme to deprive Austal Limited's shareholders and the investing public of accurate information regarding the financial performance of Austal USA, LLC's Littoral Combat Ship ("LCS") program from 2013 through August 2016. [Doc. 1.] Defendants were arraigned on April 12, 2023, and each entered a plea of not guilty on that date.

2.      On September 18, 2023, the Court entered an Order setting trial for the Court's January 2025 criminal trial term. [Doc. 84.] This Order also excluded the period between the April 12, 2023 arraignment and the January 2025 trial from the 70-day post-arraignment deadline for commencing trial under the Speedy Trial Act, concluding, in accordance with 18 U.S.C. §

3161(h)(7)(A), "that the ends of justice served by delaying trial until January 2025 outweigh the best interests of the public and the defendants in a speedy trial." [Doc. 84, PageID.300.]

3.      At the parties' April 19, 2024 Pretrial Conference, counsel for Defendants brought to the Court's attention their concerns with the current trial schedule because of Defendants' relative progress in preparing for trial in light of the extraordinary volume and complexity of the discovery in this case and other issues outlined in this Motion.

4.      At the parties' June 7, 2024 Status Conference, counsel for Defendants expressed their intent to seek a continuance of the trial until October 2025.  Counsel for the government responded that the government "would have no objection" to an April 2025 trial setting, but that the government would object to an October 2025 trial.[1]  As set forth below, the ends of justice support a continuance of the trial until October 2025.

## II.      ARGUMENT

"The granting of continuances is left to the sound discretion of the trial judge," *U.S. v. Warren*, 772 F.2d 827, 837 (11th Cir. 1985), subject to the statutory requirements of the Speedy Trial Act of 1974, 18 U.S.C. § 3161, *et seq*.  As this Court previously explained, "[a] period of delay is excluded from computing the time period within which a criminal trial must commence under the Speedy Trial Act of 1974 if it 'result[s] from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'" [Doc. 84, PageID.300 (quoting 18 U.S.C. § 3161(h)(7)(A)).]

---

[1] June 7, 2024 Status Conference Tr. 9:10–15.

"The Act itself places broad discretion in the District Court to grant a continuance when necessary to allow further preparation." *U.S. v. Rojas-Contreras*, 474 U.S. 231, 236 (1985). To that end, the Speedy Trial Act requires the Court to consider in determining whether to grant a continuance under § 3161(h)(7)(A), "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." 18 U.S.C. § 3161(h)(7)(B)(ii).[2]

For the reasons outlined below and above, Defendants submit that the ends of justice served by continuing the trial of this action until October 2025 far outweigh the "best interest of the public and defendant[s]" in proceeding to an earlier trial date. 18 U.S.C. § 3161(h)(7)(A).

**A.      This Case Is So Unusual and Complex That Defendants Cannot Reasonably Be Expected to Prepare for a Trial Commencing Before October 2025.**

Defendants' discovery and trial preparation efforts, though proceeding with diligence, are complicated by the extraordinary volume of data the government has produced in discovery, coupled with the reality that the subject matter of the government's indictment—the development and execution of a multi-billion-dollar, first-in-class U.S. Navy warship program by an international shipbuilding company—is unparalleled in complexity among the cases in this district (if not most others). It is beyond dispute that this case is both unusual and complex in terms of its subject matter and issues involved and the magnitude of the discovery necessary to proceed to trial.

---

[2] The Eleventh Circuit has also explained that "[i]t is not necessary for the court to incant specific phrases from the Speedy Trial Act or to consider each of the statutory factors on the record so long as the court provides sufficient justification for granting the ends-of-justice continuance." *U.S. v. Dunn*, 83 F.4th 1305, 1317 (11th Cir. 2023).

The issues in this case arise from Austal USA, LLC's ("Austal USA") (a subsidiary of Austal Limited, a publicly-traded Australian company whose shares traded during the relevant timeframe on the Australian Securities Exchange and over-the-counter U.S. securities market) work as a government contractor on the U.S. Navy's LCS program.  Conceived by the U.S. Navy in the aftermath of the September 11th attacks, the LCS was intended to serve as a surface combatant vessel equipped with modular "plug-and-fight" mission packages designed to service antisubmarine warfare, mine countermeasure, and surface warfare missions in the littoral (near-shore) waters.  In December 2010, Austal USA was awarded a multi-billion-dollar "block-buy" contract from the U.S. Navy to construct its first ten LCS vessels as prime contractor of the nineteen LCS vessels that Austal USA would go on to build.[3]

The issues in this case involve virtually every material aspect of Austal USA's efforts to build and deliver the earliest vessels of the U.S. Navy's *Independence* class variant[4] under the December 2010 block-buy contract over a multi-year period, including activities relative to:

- Austal USA's performance as a subcontractor to General Dynamics Bath Iron Works on the earliest two LCS vessels preceding the December 2010 block-buy contract;

- Austal USA's bidding on the block-buy contract and subsequent LCS contracts;

- Austal USA's course of dealings with U.S. Navy personnel (both locally and in Washington, D.C.) regarding Austal's performance under the block-buy contract;

---

[3] On May 18, 2024, the U.S. Navy christened the nineteenth, and final, *Independence* variant LCS at Austal USA.

[4] The LCS program involved two different vessel designs: a steel monohull variant (the *Freedom* class) constructed by Lockheed Martin in Fincantieri Marinette Marine Corporation's shipyard in Marinette, Wisconsin, and a trimaran aluminum hull variant (the *Independence* class) constructed by Austal USA in Mobile, Alabama.

- Austal USA's growth of shipyard labor and infrastructure to support the LCS program, including its hiring of over 3,000 employees and construction of a state-of-the art ship manufacturing facility in Mobile;

- Austal USA's procurement of materials for use in construction of LCS vessels;

- Austal USA's design engineering of LCS vessel systems and components;

- Austal USA's development and implementation of U.S. Department of Defense-sanctioned Earned Value Management[5] guidelines, systems, and practices;

- Austal USA's internal labor and material cost accounting systems and practices;

- Austal USA and Austal Limited's intercompany and intracompany labor and material cost reporting systems and practices;

- Austal USA's dealings and interactions with independent auditors and Department of Defense audit agencies;

- Austal USA's regular reporting to, and dealings and interactions with, U.S. Navy officials;

- Austal USA and Austal Limited's dealings with financial institutions, including Austal Limited's undertakings with respect to an international syndicated facility agreement for financing of approximately $105 million;

- Austal Limited's reporting to, and dealings and interactions with, investors and the investing public; and

- International and domestic capital market reactions to a December 2015 announcement by Austal Limited of its expected earnings and EBIT margins for

---

[5] Earned Value Management, or "EVM," is a project management methodology that integrates schedule, costs, and scope to measure project performance.

Fiscal Year 2016, and a July 4, 2016 announcement by Austal Limited of a $115 million write-back of work in progress.

These issues, moreover, involve the interplay of multiple specialized fields, each of which involve sophisticated and technical concepts and principles in their own right.  These include:

- U.S. Department of Defense EVM guidelines, systems, and practices;

- U.S. Navy procurement, contracting, and reporting requirements and practices;

- Naval warship construction and shipyard management practices;

- International financial reporting and auditing standards and practices;

- Percentage-of-completion method accounting principles and practices; and

- Principles and concepts associated with trading activities in international and U.S. domestic capital markets.

Further complicating this background is the uniquely enormous volume of data produced by the government in this case.  The government began its investigation over seven years ago in April 2017.  It executed a search warrant at Austal USA in January 2019, began making requests to the Australian Government in 2019 for relevant materials pursuant to the Treaty Between the Government of the United States and the Government of Australia on Mutual Assistance in Criminal Matters (and these requests have continued into 2024), and it compiled additional materials from various third parties over the ensuing years through formal and informal means. As a result of the length of the investigation and the breadth of the investigative steps taken, the government amassed an astonishing amount of information of approximately 17 million documents.

Based on the government's representations, Defendants understand the government to have produced these materials to Defendants in close to an "open file" manner of discovery consisting

of nearly everything in the government's possession relevant to this case.[6]  These productions,

consisting of over 46 million pages of materials, are largely split between: (i) more than 11 million

documents seized by the government through the January 2019 Austal USA search warrant, and

(ii) nearly 6 million additional documents collected by the government from various third-party

custodians (including multiple domestic government agencies, financial institutions, auditors,

investment firms, cell phone and internet service providers, and various individuals).  Although

most of the discovery received by Defendants was produced in the government's initial document

production, the government continues to make ongoing productions (even as recently as last week)

as the government continues its investigation, has engaged in additional witness interviews, and

has sought and collected additional documents from the Government of Australia.

As Defendants have previously advised the Court, Defendants had no ability to

meaningfully access (much less review) these documents for all but the last six weeks of 2023 due

to issues beyond their control.[7]  Since undertaking review of the government's discovery in

earnest, Defendants' counsel have jointly combined resources and expended thousands of hours

toward engaging in a review of the documents Defendants believe are most likely to be relevant

to the issues involved in the case.  Through this process, Defendants' counsel are steadily

reviewing and coding these materials for subject-matter relevance in an effort to streamline further

---

[6] Feb. 1, 2024 Pretrial Conference Tr. 16:23-25 (confirming that "all the material has been turned over.")

[7] First, due to the volume of discovery and the expense associated with it, there was no way to proceed with analyzing the discovery without insurance coverage.  Insurance coverage disputes prevented Defendants from retaining an electronic discovery platform and vendor necessary to upload and maintain this volume of data.  Once these disputes were resolved, there were additional delays associated with the unavoidable technological limitations of actually ingesting that much data into a computer system (more than twenty terabytes of data across nearly thirty hard drives). The quantity of data is so large here that it took Defendants' e-discovery vendor *over two months* to load the data into the review database.

review and trial preparation efforts. Defendants' counsel have also employed state-of-the-art technologies and methods in an effort to refine this process, including the use of machine learning systems to predictively locate the documents most likely to be relevant.

But even with the best technologies, Defendants' collective and individual abilities to identify and review the corpus of relevant documents are limited by the sheer scale of the productions. The volume of discovery here is so large that running search terms and applying date, custodian, and other filter parameters against the universe of discovery still yields massive numbers of documents. (As just one example, a search of only the Defendants' names reveals more than a million documents.) Defendants have been and will continue to use all the technical tools available to them to optimize the efficiency of their review process, but it is a daunting task even under the best of circumstances.

Only once that review for relevancy is complete can Defendants' counsel work to actually *analyze* the information and provide the same to their consultants and experts to efficiently perform their work in preparation for trial. (Defendants cannot simply turn over a database of nearly twenty million documents to their retained consultants and experts.) And, of course, the substance of these materials is painstakingly dense given the enormously complex subject matters involved. Many of the most relevant documents, for instance, are large financial spreadsheets, shipbuilding schedules, and highly detailed vessel cost reports that require significant allotments of time to analyze—both within the documents' four corners and in order to make sense of them within the larger set of information, events, and occurrences with respect to Austal USA's LCS program.

Notably, the Court previously determined in its September 18, 2023 Order setting this case for trial in January 2025 that the "ends of justice" standard of § 3161(h)(7)(A) was satisfied, and nothing about this case has become less unusual or complex in the intervening months. On the

contrary, it is only since the end of 2023 that Defendants have been able to meaningfully access the government's voluminous productions and come to appreciate in a more informed manner the roadblocks to proceeding to a trial within the first half of 2025.  Indeed, since obtaining access to the government's productions, Defendants have only encountered additional concerns about the productions.

Although the government has taken certain steps to make the discovery in this case more manageable for Defendants, those efforts (though undoubtedly more helpful than not) have proved to be of limited practical value given the sheer scale of these productions.   For example, the government has identified from within the nearly 20 million documents a narrower subset of approximately 35,000 documents it characterized as "hot" and deemed to be "among the most relevant documents" in the case.   But after reviewing these approximately 35,000 "hot" documents, Defendants realized that many key documents had not actually been designated as "hot."   To be clear, the government has never represented that the 35,000 "hot" documents designated by it constitute all of the most relevant documents in this case, and Defendants in no way intend to suggest as much.  But the simple reality is that, due to the scale of discovery and the complexity of the underlying subject matters in issue, Defendants—now armed with the benefit of having made their way through a portion of the documents—understand they must undertake a far more comprehensive review of the nearly 20 million documents produced to date than previously envisioned.

Defendants have encountered numerous technical issues with the government's productions including, but not limited to, overlapping Bates numbers among different productions, documents produced without native files, password-protected documents, documents produced without Bates numbers, documents produced as PDFs without searchable metadata, and e-mail

documents produced without their attachments.  The defense has raised technical issues to the government as they have arisen, or attempted to resolve them without government assistance, but some issues remain outstanding, and even where remedies have been provided or improvised, they have delayed the Defendants' ability to review the discovery.  For example, Defendants first learned on April 30, 2024 that an apparent mismatch existed between the Bates numbers of the "hot" and "responsive search warrant" documents produced to Defendants by the government and the Bates numbers of those same documents  in the government's original larger production (from which the "hot" and "responsive" documents were reportedly culled), which brought into question whether Defendants had expended their resources reviewing and coding thousands of documents that were not actually "hot" or "responsive" to the search warrant.  Defendants raised this issue with the government within hours of learning about it, and the government ultimately reported that there was an error in their Bates labeling of 1,090 of the "hot" and "responsive" to search warrant documents.  Although, thankfully, the issue appears to have been isolated to only those 1,090 documents, Defendants were forced to suspend their review of the "responsive" search warrant records for the two weeks it took to resolve the issue due to the risk of wasting resources reviewing records that were not actually "responsive" to the search warrant.

In sum, Defendants are appreciative of the efforts the government has been willing to extend thus far, but the reality is that, even with the benefit of these efforts, Defendants must still undertake a massive review of enormously complex information to fairly prepare for trial.

B.      **The Ends of Justice Served by Continuing the Trial Until October 2025 Outweigh the Public's Interests in a Speedier Trial.**

The government does not oppose a continuance of the current January 2025 trial; it only objects to continuing the trial beyond April 2025.  Defendants respectfully submit that the government cannot demonstrate that any public interest in proceeding to an April 2025 trial

10

outweighs the ends of justice served by continuing the trial an additional six months to October 2025.

Defendants cannot predict what precisely the government would argue the public's interest is in a trial setting sooner than October 2025. However, the U.S. Supreme Court has explained what Congress had in mind with respect to the "public interest" component of the § 3161(h)(7)(A) analysis:

> As both the 1974 House and Senate Reports illustrate, the Act was designed not just to benefit defendants but also to serve the public interest by, among other things, reducing defendants' opportunity to commit crimes while on pretrial release and preventing extended pretrial delay from impairing the deterrent effect of punishment. *See* S. Rep. No. 93–1021, pp. 6–8 (citing "bail problems," offenses committed during pretrial release, and the "seriously undermined ... deterrent value of the criminal process" as "the debilitating effect[s] of court delay upon our criminal justice system"); H.R. Rep. No. 93–1508, p. 8, U.S. Code Cong. & Admin. News 1974, pp. 7401, 7402 ("The purpose of this bill is to assist in reducing crime and the danger of recidivism by requiring speedy trials ..."). The Senate Report accompanying the 1979 amendments to the Act put an even finer point on it: "[T]he Act seeks to protect and promote speedy trial interests that go beyond the rights of the defendant; although the Sixth Amendment recognizes a societal interest in prompt dispositions, it primarily safeguards the defendant's speedy trial right— which may or may not be in accord with society's." S. Rep. No. 96–212, p. 29; see also id., at 6; H.R. Rep. No. 96–390, p. 3 (1979), U.S. Code Cong. & Admin. News 1979, 805, 807.

*Zedner v. U.S.*, 547 U.S. 489, 501–02 (2006). Given that the alleged wrongdoing here occurred roughly a decade ago, none of the Defendants has a criminal history, the government's investigation proceeded for six years before returning an indictment, the government has stated no objections to Defendants' pretrial release conditions, and the government has already confirmed it has no objection to a continuance of the trial to April 2025, there can be no serious argument that extending the trial an additional six months until October 2025 will increase the "defendants' opportunity to commit crimes while on pretrial release" or "impair[] the deterrent effect of punishment." *Id.*

11

To the extent the government expresses any concern that witness memories may fade with the requested continuance, this is an issue that impacts both sides. But even if this case had been tried within the Speedy Trial Act's 70-day window after Defendants' April 12, 2023 arraignment, the parties would still have had to contend with the concern of stale memories given the significant passage of time between the underlying events and the conclusion of the government's lengthy investigation that began in April 2017. In the context of this case (which focuses on conduct occurring in the 2013 to 2016 timeframe) there is no meaningful difference in the likely state of memories between April 2025 and six months thereafter.

On balance, the ends of justice served by allowing Defendants until October 2025 to prepare for trial rather than April 2025 greatly outweigh any arguable public interest that may be impacted by the six-month difference between the parties' positions on the duration of the continuance. The government has had *seven years* to review the materials it has collected in its investigation of this matter, compared to Defendants' approximately seven months of meaningful access to the documents. Defendants certainly do not claim they are entitled to the same length of time to prepare for trial as the government had to investigate its case. But the reality is that every week of additional trial preparation is of incalculable value to Defendants in a case as extraordinarily complex as this one, and it is certainly not in the public's (nor Defendants') interests to try this case prematurely. *See U.S. v. Bikundi*, 926 F.3d 761, 779 (D.C. Cir. 2019) ("[T]he district court's concern that adequate time was needed for the defense to review the documents produced in discovery and to prepare the defense was directly related to the public interest that trial not proceed prematurely."); *U.S. v. Gardner*, 488 F.3d 700, 718 (6th Cir. 2007) (continuance "satisif[ied] the requirements of the [Speedy Trial] Act" where district court wrote the "'Defendants are likely to be prejudiced if they are not adequately prepared for trial despite

12

due diligence, and the public interest will not be served if such prejudice ultimately requires this case to be retried.'"). *See also Bloate v. U.S.*, 559 U.S. 196, 197 (2010) ("In setting forth the statutory factors justifying a subsection (h)(7) continuance, Congress twice recognized the importance of adequate pretrial preparation time.").

It is with this in mind that, although Defendants' counsel previously conferred with the government regarding a potential May 2025 trial setting, on further reflection there are grave concerns that any trial setting prior to October 2025 would not be realistic. There is simply an inordinate amount of work that remains in attempting to complete a review of what are likely to be the most relevant documents, providing the most pertinent materials to Defendants' consultants and experts for necessary assistance regarding the complex background and subject matters of this case, and engaging in all the other activities that are necessary to adequately prepare for and proceed to a fair trial. Defendants submit that, for these reasons, the ends of justice require a trial setting no sooner than October 2025.

## III.    CONCLUSION

Defendants respectfully request that the Court continue the current January 2025 trial setting to October 2025 because the ends of justice served by this continuance greatly outweigh the public interests in a speedier trial. Alternatively, although Defendants believe that October 2025 is the most appropriate trial setting under these circumstances, in the event the Court is not inclined to continue the trial beyond April 2025 (to which the government does not object), Defendants request that trial be scheduled for as late in the month of April 2025 as practicable.


Dated: June 17, 2024                              Respectfully submitted,

                                                            */s/ Jack W. Selden (with permission)*
                                                            Jack W. Selden


13

Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North Birmingham,
Alabama 35203
205.521.8000 (phone)
205.521.8800 (facsimile)
jselden@bradley.com

Gregory G. Marshall (Admitted *Pro Hac Vice*)
Erin K. Sullivan
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, DC 20036
202.393.7150 (phone)
202.719.8309 (facsimile)
gmarshall@bradley.com
esullivan@bradley.com

*Counsel for Craig D. Perciavalle*


*/s/ James R. Sturdivant (with permission)*
James R. Sturdivant
Robert R. Baugh
Alyse N. Windsor
Dentons Sirote PC
2311 Highland Avenue South
Birmingham, AL 35205
United States
205.930.5100 (phone)
205.930.5101 (facsimile)
jim.sturdivant@dentons.com
alyse.windsor@dentons.com
robert.baugh@dentons.com

*Counsel for Joseph A. Runkel*


*/s/ Frederick G. Helmsing, Jr.*
Frederick G. Helmsing, Jr.
T. Hart Benton, III
McDowell Knight Roedder & Sledge, LLC
11 North Water Street, 13th Floor
Battle House Tower
Post Office Box 350 (36601)
Mobile, Alabama 36602

14

251.432.5300 (phone)
251.432.5303 (facsimile)
fhelmsing@mcdowellknight.com
tbenton@mcdowellknight.com

*Counsel for William O. Adams*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, I filed electronically the foregoing with the Clerk of the Court using the Court's CM/ECF system, thereby serving this filing on all attorneys of record in this case.

/s/ *Frederick G. Helmsing, Jr.*
Frederick G. Helmsing, Jr.

15