IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CRAIG D. PERCIAVALLE,<br>JOSEPH A. RUNKEL, and<br>WILLIAM O. ADAMS,<br><br>             Defendants. | Criminal Action No. 1:23-CR-00070-JB-N |

**DEFENDANTS' JOINT MOTION FOR *IN CAMERA* REVIEW
AND DISCLOSURE OF GRAND JURY MATERIALS**

Defendants Craig Perciavalle, Joseph Runkel, and William Adams ("Defendants") hereby jointly move pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) for *in camera* review and disclosure of any legal instructions, legal guidance, or closing comments provided by the government to the grand jury.

**INTRODUCTION**

The indictment and statements made post-indictment by the government in public filings and on the record at a motions hearing in this case strongly suggest that the grand jury was not afforded accurate instruction with regard to the requirements of the wire fraud statute that the defendants are charged with violating. The language of the statute, reinforced and affirmed by Supreme Court decisions reached post-indictment, makes clear that for a defendant to have committed wire fraud he must have schemed to obtain his victim's money or property, but the record in this case strongly suggests that the grand jury was inaccurately or misleadingly instructed as to this requirement. In particular, in its filings opposing the defendants' joint motion to dismiss the indictment for failure to state an offense (Doc. 129) and in its statements at the hearing held by

the Court on that motion, the government described its theory of liability in ways that are inconsistent with each other, the indictment, the statutory language, and recent Supreme Court opinions. These statements—none of which sets forth a legally viable theory of wire fraud—suggest a strong likelihood that the grand jury was misinformed as to the necessary elements of wire fraud when it voted to indict the defendants.

The Grand Jury Clause of the Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The grand jury determines if there is probable cause to believe that a crime has been committed and thus protects citizens against unfounded prosecutions. A grand jury can only perform its function if it is provided with accurate facts and legal instructions. *See United States v. Ciambrone*, 601 F.2d 616, 622 (2d Cir. 1979) (grand jury depends on prosecutor as its "investigator and legal advisor to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles").

The "indispensable secrecy of grand jury proceedings" may be broken "where there is a compelling necessity." *U.S. v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). In accordance with this principle, the Federal Rules of Criminal Procedure allow courts to authorize disclosure of grand jury transcripts in certain narrow circumstances, including "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The erroneous legal instructions that the grand jury appears to have received in this case as to what conduct constitutes wire fraud are that rare ground requiring dismissal of the indictment. The job of a grand jury is to determine whether "there is probable cause to believe that a crime was committed and that the defendant was the party who committed the crime." *U.S. v. Jennings*, 991 F.2d 725, 729 (11th Cir. 1993). The grand jury's

decision to indict these defendants on allegations that they committed the crimes of conspiracy to commit wire fraud and wire fraud cannot have been independent of the legal advice provided them by the prosecution as to what that crime is.

For this reason, the defendants respectfully ask that the Court order the government to provide the grand jury minutes, including any legal advice or instruction, for the Court's *in camera* review. Should the Court determine that the minutes reveal erroneous instruction or guidance as to the requirements of the wire fraud statute, then the defendants request that the Court order disclosure of those portions of the minutes to the defendants so that they may move for dismissal of the indictment accordingly.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 6(e) provides that this Court "may authorize disclosure" of grand jury transcripts "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." *See* Fed. R. Crim. P. 6(e)(3)(E)(ii). Such disclosure may be made "at a time, in a manner, and subject to any other conditions" that the Court directs. *Id.* Dismissal of an indictment for errors in grand jury proceedings is appropriate "'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)). Erroneous and prejudicial legal instruction to a grand jury is a well-recognized basis to dismiss or partially dismiss an indictment. *See, e.g.*, *United States v. Bowling*, 108 F. Supp. 3d 343, 352-53 (E.D.N.C. 2015) (dismissing three counts of indictment where government's erroneous legal instruction to the grand jury played a "significant and impermissible" role in the grand jury's decision to indict); *United*

*States v. Stevens*, 771 F. Supp. 2d 556, 567-68 (D. Md. 2011) (dismissing indictment where government failed to properly instruct grand jury regarding the advice of counsel defense); *United States v. Peralta*, 763 F. Supp. 14, 20-21 (S.D.N.Y. 1991) (dismissing indictment where government provided grand jury with misleading explanations of the law of constructive possession).

"[T]he party seeking disclosure of grand jury material must show a compelling and particularized need for disclosure." *United States v. Aisenberg*, 358 F.3d 1327, 1348 (11th Cir. 2004) (citation omitted); *see also United Kingdom v. United States*, 238 F.3d 1312, 1320–21 (11th Cir. 2001). District courts possess wide discretion in determining whether to order disclosure of grand jury materials. *See United Kingdom*, 238 F.3d at 1320. In determining whether to authorize disclosure, courts look to whether the moving defendant has shown "the existence of a factual basis for his claims." *United States v. Roemmele*, 646 F. App'x 819, 822 (11th Cir. 2016) (per curiam) (citing *United States v. Rodriguez*, 765 F.2d 1546, 1559 (11th Cir. 1985)). The "particularized need" so demonstrated by the defendant must be "greater than the need for continued secrecy," and the defendant's request for disclosure must be "structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 221 (1979). *See also Pittsburgh Plate Glass Co. v. U.S.*, 360 U.S. 395, 400 (1959) ("The burden . . . is on the defense to show that a particularized need exists for the [grand jury] minutes which outweighs the policy of secrecy.") (internal quotation marks omitted). "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil*, 441 U.S. at 223.

## ARGUMENT

**A. The defendants have a particularized need for the transcripts sought.**

Since this case was indicted in March of 2023, two Supreme Court cases have clarified the reach of the federal wire fraud statute that the defendants are charged with violating. The defendants have filed a motion to dismiss the indictment for failure to state an offense (Doc. 129), and the government has responded to that motion, both in paper filings (Docs. 131, 166) and at oral argument before the Court. Discrepancies between the language of the indictment, the government's representations of the allegations in its public filings, and the government's statements on the record at oral argument cast serious doubt as to whether the legal instructions provided to the grand jury regarding the requirements of the wire fraud statute were accurate and not misleading.

Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure provides that the Court may authorize disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The Supreme Court has held that an indictment may be dismissed on the basis of a matter occurring before the grand jury only upon a showing of prejudice to the defendant, and that such prejudice has occurred "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (internal citation omitted).

Here, the public record demonstrates a serious risk that the grand jury voted to indict the defendants on the basis of erroneous instructions stating or suggesting that a person who schemes to deprive another person of money, property, or accurate financial information may have violated the wire fraud statute, even if he did not scheme to obtain the defrauded victim's money or property.

If so instructed, the grand jury received plainly erroneous guidance that was fundamental to the grand jury's decision to indict and that therefore warrants dismissal of the charges. *See, e.g.*, *Stevens*, 771 F. Supp. 2d at 568 (dismissing indictment where "[t]he Court ha[d] grave doubts as to whether the decision to indict was free from the substantial influence of the improper advice of counsel instruction" to the grand jury); *Peralta*, 763 F. Supp. at 20–21 & n. 10 (after court's *in camera* review of grand jury transcript, dismissing indictment based in part on government's "misleading statements of law" and observing that none of the case law cited by the prosecution "permits a prosecutor to mislead a grand jury as to what elements it must find in order to return an indictment for possession of contraband"). Further, the indictment itself is facially invalid and cannot be relied upon to dispel "grave doubt" that the error did not substantially influence the decision to indict. Indeed, the defendants believe that the indictment's insufficiency is a result of the grand jury being misinformed as to the law. Therefore, the defendants have a particularized need for the Court to undertake an *in camera* review of any legal instructions or advice provided by the government to the grand jury and to disclose to the defense instructions or advice that represent an incorrect or misleading statement of the requirements of the wire fraud statute.

1. *The government's post-indictment articulations of its wire fraud theory, when compared to each other and to the indictment itself, raise a significant question as to whether there were legal errors in the government's legal instructions to the grand jury.*

The government's public articulations of its wire fraud theory in filings and at oral argument are inconsistent with each other, with the indictment, and with the controlling case law. These inconsistencies cast significant doubt on whether the grand jury was provided correct instructions with regard to the elements of a wire fraud violation.

First, take the requirement, clearly established in *Ciminelli v. United States*, 598 U.S. 306 (2023), that the object of a wire fraud scheme be a traditional property interest. The goal of the

scheme cannot be to deprive a victim of "the right to valuable economic information." *Id.* at 316. In its post-*Ciminelli* explanations of its wire fraud theory, the government has stated that "[n]owhere in the Indictment is a 'right to control' theory of fraud alleged, and the Government is not proceeding on a right to control theory of fraud." Doc. 131 (Gov't Resp. to Defs' Mot. to Dismiss), PageID.562. Instead, the government contends, the indictment "alleges a scheme to trick investors into parting with their money to purchase shares of Austal Limited." *Id.* But, as detailed at length in the defendants' motion to dismiss and reply in support thereof (Doc. 129, PageID.526–540; Doc. 132, PageID.585–594), the indictment does not say that shareholder's money was the object of the scheme; it says that the purpose of the scheme was to "mislead" shareholders (i.e., to deprive them of valuable economic information) in order to "maintain or increase the share price." Doc. 1, PageID.5. The absence of any reference in the indictment to shareholders' money suggests that the grand jury was instructed that the defendants could have violated the wire fraud statute simply by misleading shareholders without any purpose to obtain their money.

Next, since the decision in *Ciminelli*, the government has stated repeatedly that the indictment alleges a scheme to *deprive* shareholders of their money. For example, the government made the following representations and arguments in its response to the defendants' motion to dismiss.

- The indictment "alleges a scheme to trick investors into parting with their money to purchase shares of Austal Limited." Doc. 131 (Gov't Resp. to Defs' Mot. to Dismiss), PageID.562.

- "In order to maintain and increase the share price, investors must either buy or hold stock, meaning they will be parting with their money or property." *Id.* at PageID.563.

7

- The defendants "are charged with wire fraud for providing false information about Austal USA's financial performance in order to induce shareholders to part with their *money or property*." *Id.* at PageID.565 (emphasis in original).

- "[T]he false and misleading statements about Austal USA's financial condition and the performance of the LCS program were the means by which the defendants intended to obtain the object of the scheme: Depriving investors of money or property (i.e., causing investors to purchase Austal Limited stock that they otherwise would not have)." *Id.* at PageID.572.

This last statement is perhaps the most instructive: the government says that the "object" of the scheme that the defendants allegedly "intended to obtain" was not shareholder money itself but rather the act of "depriving investors of money or property." *Id.* The government could not be clearer that, at least after *Ciminelli* was issued (post-indictment), its theory is that the object of the alleged scheme was to deprive shareholders of their property. But again, the grand jury's indictment makes no reference to the defendants targeting shareholders' money. And so it is unclear whether the grand jurors understood that, in fact, the object of the wire fraud scheme *must* be to obtain money or another traditional property interest.

Finally, at oral argument on the defendants' motion to dismiss, which occurred after the Supreme Court's decision in *Kousisis v. United States*, 605 U.S. 114 (2025), the government's theory shifted again. While continuing to maintain that the money-or-property object of the alleged scheme is shareholders' money, at oral argument the government's attorney argued:

> The defendants sought to deprive investors by inducing them to invest in Austal Limited under the false belief that . . . it was generating more profit than it actually was. And the defendants then sought to acquire that money through the unjust enrichment that they were receiving through the financial performance of the company, which included compensation, stock, and other benefits. The defendants, thus, gained from investors parting with their money in this case and, therefore, sought to obtain the money of those investors.

Transcript of Aug. 20, 2025 Motions Hearing, at 13:10–20 (attached as Exhibit A). This construction—that gaining compensation from an employer due to the financial performance of

8

the company is somehow equivalent to seeking to obtain the money of secondary-market investors (as opposed to the money of the employer)—is so convoluted as to be meaningless.

To be sure, the indictment states that the purpose of the scheme to defraud was to mislead shareholders in order, in part, to "unjustly enrich [the defendants] and others through the continued receipt of compensation, stock, and other benefits." Doc. 1, PageID.5–6. But the government has been adamant (and consistently so) that the indictment does not allege a scheme by the defendants to defraud *Austal* of *Austal's money* in the form of the "compensation, stock, and other benefits" received from Austal by the defendants. *See* Doc. 131 (Gov't Resp. to Mot. to Dismiss), PageID.578 ("The Government is not proceeding on a theory that it was the defendants' employer that was defrauded"); *id.* at PageID.578, n.4 ("[T]he unjust enrichment alleged in the Indictment is simply about the financial benefit the defendants received due to their scheme to defraud Austal Limited's shareholders and the investing public out of their money or property.").[1]

In other words, the government has been abundantly clear that the indictment does not allege a scheme to obtain money or property, in the form of continued compensation and benefits, from the defendants' employer by engaging in conduct calculated to mislead the employer into believing the defendants were performing their job more successfully than they actually were. Presumably, therefore, that was not the scheme presented to the grand jury.[2] To the contrary, the government has consistently stated that the money or property that is the object of the scheme is shareholders' money or property.

---

[1] It is also important to note that the indictment nowhere alleges that the defendants' "continued receipt" of compensation and benefits was dependent on or tied to the financial performance of the company in any way. *See* Doc. 1, Indictment.

[2] If it were, the charges would be due to be dismissed on the ground that continued receipt of compensation does not constitute "money or property" for purposes of the wire fraud statute. *See* Doc. 129, Defs.' Mot. to Dismiss, at PageID.535–537.

9

Later in her oral argument, the government's attorney advanced another, very different theory of a scheme to obtain that shareholder property:

> A shareholder in a publicly traded company is an owner of that company. In a scheme like this one, the defendants and their coconspirators were seeking to artificially increase or maintain the share price by having new people buy into the company. And so how that happens is old owners of the company are selling their shares to new owners of the company. And so even under the defendants' own standard, these folks are, in fact, affiliated with the defendants because they are owners of the company.

Exhibit A (Mot. Hearing Trans.), at 15:6–15. Totally aside from whether a holder of Austal Limited shares traded on the secondary market is actually an "owner" of the assets and liabilities of Austal Limited (as opposed to simply an "owner" of Austal Limited stock), there is absolutely no indication in either the indictment or in any statement by the government since the indictment (other than the one quoted here) that the defendants are alleged to have schemed to obtain money or property for the benefit of unidentified Austal shareholders who sold stock on the secondary market at allegedly inflated prices.

Still later, the government's attorney asserted a third and fourth theory of "obtain" that do not appear in the indictment.

> [T]he defendants here, as alleged in paragraph 14, are looking for investors to part with their money on the public exchange. Obviously that money is going to third parties, and that allows them to personally enrich themselves because the increased share price benefits them. It benefits their company. And this is [a] classic public market accounting fraud scheme where a company is benefited by having a higher share price of its stock. It has access to more capital. It raises its market value. All of that stands to benefit the company.

*Id.* at 24:23 – 25:6. She then responded "Yes," to the Court's subsequent inquiry, "[Y]ou say that's what paragraph 14 [of the indictment] says." *Id.* at 25:12-14. To the contrary, a simple review of the indictment demonstrates that it nowhere comes close to alleging that the defendants schemed to benefit the company by increasing the company's ability to access to capital or to benefit

themselves by raising the value of their own stock.  (Indeed, none of the defendants sold any stock during the time period of the alleged fraud.[3])  Even if the indictment could be read to allege these theories, neither theory conforms to the statute's requirement that a wire fraud scheme to defraud a victim must be one to obtain *the victim's* money or property.

Despite the plain language of the statute proscribing schemes "for *obtaining* money or property," 18 U.S.C. § 1343 (emphasis added), the government has made no attempt other than these four very different theories advanced at oral argument to explain how the defendants supposedly schemed to obtain shareholders' money or property.  Tellingly, after advancing these novel theories, the government's attorney reverted to referencing pre-*Kousisis* case law to suggest that, despite *Kousisis*'s holding that a wire fraud scheme is one to *obtain* money or property rather than to cause an economic loss, and despite the plain language of the statute stating the same, there is in fact no requirement that the alleged scheme be one to obtain money or property, because "the Supreme Court often varies in how it frames the money or property requirement changing between 'depriving' and 'obtaining.'"  Exhibit A, at 16:4–19.  Referring to the Supreme Court's decision in *Kousisis*, she stated, "They did define 'obtain,' but . . . obviously the definition of 'obtain' can't be the end of the inquiry in light of the decades of precedent of what constitutes wire fraud."  *Id.*, at 22:11-15.

But of course, the Supreme Court's recent definition of, and concurrent emphasis on, a key word appearing in the wire fraud *statute is* the "end of the inquiry" when it comes to what that word means.  Moreover, *Kousisis*'s emphasis on the requirement that a wire fraud scheme be one to "obtain" a victim's money or property was precisely intended to correct "decades of precedent"

---

[3] Neither Mr. Runkel nor Mr. Adams owned any Austal Limited securities during the time period set forth in the indictment.  While Mr. Adams did acquire Austal Limited securities after the write-back in July 2016, Mr. Runkel has never owned any Austal Limited securities.

11

in which prosecutors and courts often ignored the statute's plain language in favor of a focus on whether an alleged scheme was intended to cause a loss to the victim.

Therein lies the problem: the inconsistencies in the government's various articulations of its theory of wire fraud in this case leave almost no doubt that the grand jury was instructed or otherwise led to believe that it could indict the defendants on wire fraud charges based solely on an alleged scheme either to mislead shareholders or to deprive shareholders of money, without any requirement that the defendants schemed to obtain (for themselves or another) that shareholder money. Because such erroneous instructions or their equivalent would have "substantially influenced the grand jury's decision to indict," *Bank of Nova Scotia*, 487 U.S. at 256, and therefore constitute a "ground . . . to dismiss the indictment," Fed. R. Crim. P. 6(e)(3)(E)(ii), the defendants have a particularized need for the Court's *in camera* review of the grand jury minutes to determine whether such error occurred.

> 2. *The Supreme Court's decisions in* Ciminelli *and* Kousisis, *reached after the indictment in this case issued, reinforced that the text of the wire fraud statute, and not prior case law departing from that text, is what controls*.

After the indictment issued in this case—and therefore after any instructions were provided to the grand jury in connection with its consideration of the proposed charges—the Supreme Court decided two cases that reinforced that the wire fraud statute should be read to mean what it says: *Ciminelli v. United States*, 598 U.S. 306 (May 11, 2023), and *Kousisis v. United States*, 605 U.S. 114 (May 22, 2025). In *Ciminelli*, the Supreme Court invalidated the "right to control" theory of wire fraud and held that the object of a wire fraud scheme must be a "traditional property interest[]" and not simply "valuable economic information needed to make discretionary economic decisions." 598 U.S. at 316. The Court then further clarified, in *Kousisis*, that a wire fraud scheme must be one to *obtain* that money-or-property object and not simply to deprive another of it. 605

12

U.S. at 124 ("The statute does not so much as mention loss, let alone require it. Instead, a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off.")

The Supreme Court's unanimous decisions in *Ciminelli* and *Kousisis* were not minor evolutions in the jurisprudence interpreting the wire fraud statute. To the contrary, they abrogated significant lines of well-developed case law across the country that were valid when the grand jury in this case was instructed. For example, *Kousisis* abrogated the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307, 1312–14 (11th Cir. 2016), which defined a wire fraud scheme by reference to the harm sought to be inflicted on the victim rather than the object sought to be obtained by the perpetrator. It is reasonable to suspect that any instructions provided to the grand jury prior to the Supreme Court's decisions in *Ciminelli* and *Kousisis* might be erroneous in light of those decisions.

Where there has been an intervening change or clarification of law since the issuance of an indictment by the grand jury, and where there is reason to believe that the grand jury may have been erroneously instructed, even if unintentionally so, prior to that change, disclosure of the instructions is appropriate to determine whether the grand jury's decision to indict was indeed "free from the substantial influence" of the erroneous instruction. *Bank of Nova Scotia*, 487 U.S. at 256. That is because, "[a]s a legal advisor to the grand jury, the prosecutor must give the grand jury sufficient information concerning a relevant law to enable it intelligently to decide whether a crime has been committed." *U.S. v. Twersky*, 92-CR-1082, 1994 WL 319367, at *4 (W.D.N.Y. June 29, 1994) (quotation omitted). The defendants in *Twersky* were charged with money laundering and structuring violations in 1993. The next year, in *Ratzlaf v. United States*, 510 U.S. 135 (1994), the Supreme Court clarified the meaning of "willfulness" for purposes of the anti-structuring law. The

*Twersky* court found that an *in camera* review of the instructions provided to the grand jury was warranted to determine whether the grand jury was misled based on the pre-*Ratzlaf* law. 1994 WL 319367, at *5. Likewise, in *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411 (D.P.R. 2017), the court found that the defendants had a particularized need for the court to conduct an *in camera* review of the grand jury instructions based on an intervening decision by the First Circuit interpreting the federal program bribery statute, 18 U.S.C. § 666, as excluding a gratuity theory of liability. *Id.* at 414–16. *See also U.S. v. Hoey*, 11-CR-337, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (granting *in camera* review of jury instructions as to portions of the indictment that resulted in a statutory penalty enhancement, in light of the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 881 (2014), which narrowed the standard of causation necessary to trigger the enhancement).

Here, given the Supreme Court's decisions in *Ciminelli* and *Kousisis*, it is probable the "government incompletely or erroneously provide[d] legal instruction to the grand jury," *Hoey*, 2014 WL 2998523, at *3, and that such error "substantially influenced the grand jury's decision to indict," *Bank of Nova Scotia*, 487 U.S. at 256. This is particularly true in light of the indictment's wording and the government's post-indictment explanations of its theory (addressed *supra*), neither of which provides any assurance (or even suggestion) that the grand jury understood that in order to violate the wire fraud statute, the defendants must have schemed to obtain money or property from the defrauded victim of the scheme. *See Kousisis*, 605 U.S. at 124 ("a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property'"); *U.S. v. Russ*, No. 24-11086, 2026 WL 125724, at *3 (11th Cir. Jan. 16, 2026) ("Just like the Supreme Court found in *Kousisis* . . . as long as the individuals *obtained* the contract through fraudulent means, it does not matter that services were provided because wire fraud still occurred as the money was *obtained*

fraudulently.") (emphasis added); *U.S. v. Rinsch*, --- F. Supp. 3d ---, 2026 WL 160638, at *1 (S.D.N.Y. Jan. 21, 2026) ("Fraud classically consists of obtaining a victim's money or property by means of lies. If it is done intentionally and involves the use of the mail or interstate wires, it becomes a federal crime."); *id.* at *2 ("[W]hat the [wire fraud] statute proscribes is limited to obtaining money and property by fraudulent means. To 'obtain' means 'to bring into one's own possession; to procure.'") (internal citations omitted).

The defendants have a particularized need for the Court to review the grand jury instructions *in camera* to determine whether the grand jury was erroneously instructed or advised that the defendants could have violated the wire fraud statute simply by scheming to *deprive* shareholders of money or property, by scheming to *deprive* shareholders of valuable economic information, or by scheming to obtain compensation from their employer by means of *depriving* the alleged victim of the scheme (i.e., shareholders) of money or property. Any such erroneous legal instruction could have "played a significant and impermissible role in the grand jury's decision to indict" the defendants. *U.S. v. Bowling*, 108 F. Supp. 3d at 352–53

3. *The indictment is invalid on its face.*

Finally, as set forth in the defendants' joint motion to dismiss (Doc. 129), the indictment in this case is facially invalid due, in large part, to its failure to allege a cognizable wire fraud scheme that had as its object the obtaining of money or property. The language of the indictment itself, therefore, does not dispel the "grave doubt" that the grand jury's decision to indict was substantially influenced by erroneous legal instructions. *Bank of Nova Scotia*, 487 U.S. at 256.

The defendants will not repeat here the arguments detailed in their motion to dismiss (Doc. 129), reply in support of that motion (Doc. 132), response to the government's notice of supplemental authority concerning *Kousisis* (Doc. 169), and at the hearing held by the Court in

15

August 2025, but they incorporate those arguments into this motion by reference. In short, the indictment does not allege that the defendants schemed to obtain money or property, either for themselves or for the benefit of another party. *See* Doc. 1, Indictment. Because the text of the wire fraud statute and controlling case law make clear that "[t]o be guilty of wire fraud, a defendant must (1) devise or intend to devise a scheme (2) to obtain money or property (3) by means of false or fraudulent pretenses, representations, or promises," *Kousisis*, 605 U.S. at 123 (citing 18 U.S.C. § 1343) (cleaned up), the absence of any allegation that the defendants schemed to obtain the money or property of any defrauded victim is fatal to the indictment.

The indictment's failure to allege a scheme to obtain money or property from a victim by means of false representations strongly suggests that the grand jury was instructed, erroneously, that it could indict the defendants on the basis of something other than such a scheme. The defendants plainly have a particularized need to review any instructions provided to the grand jury that would have caused it to issue the invalid indictment against them. While the indictment is insufficient and should be dismissed based on its four corners (*see* Doc. 129, Defendants' Motion to Dismiss), erroneous, misleading, or incomplete legal instructions provided to the grand jury as to the elements of a wire fraud violation would raise "'grave doubt' that the decision to indict was free from the substantial influence of such" errors and establish another, independent basis for dismissal. *Bank of Nova Scotia*, 487 U.S. at 256 (citing *Mechanik*, 475 U.S. at 78).

**B. The defendants' particularized need for limited disclosure of the instructions provided to the grand jury outweighs the interest in maintaining grand jury secrecy.**

The "particularized need" shown by the defense must "outweigh[] the policy of secrecy" in the grand jury. *Pittsburgh Plate Glass Co.*, 360 U.S. at 400. *See also Douglas Oil*, 441 U.S. at 222. Where the grand jury proceedings are complete, "the interests in grand jury secrecy" are "reduced." *Id. See also United States v. Mahoney*, 495 F. Supp. 1270, 1273 (E.D. Pa. 1980)

16

(quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234 (1940)) ("When the grand jury has completed its work, obviously the policy reasons for secrecy are lessened, and in this light the Supreme Court has held that at that time 'disclosure is wholly proper where the ends of justice require it.'").

The indictment in this case issued almost three years ago. There is no reason to believe that any grand jury proceedings in relation to the case are ongoing. The possible chilling effect on future grand juries of a compelled disclosure is minimal compared to the great danger that the grand jury indicted the defendants based on a fundamental misunderstanding of the law the defendants are accused of violating. Moreover, the government has already disclosed to the defense several transcripts of fact witness testimony given in the grand jury but has withheld transcripts of any testimony provided to the grand jury by law enforcement agents. None of the transcripts that were produced suggests that the government correctly instructed the grand jury with regard to the requirement that, to have committed wire fraud, the defendants must have schemed to obtain the money or property of the victim of the fraud. A limited disclosure of any legal instructions or advice provided by the government to the grand jury is necessary to ensure that the grand jury in this case properly fulfilled its constitutional function and did not deprive the defendants of the "basic protection which the guaranty of the intervention of the grand jury was designed to secure." *Russell v. United States*, 369 U.S. 749, 770 (1962).

C. **The requested disclosure is narrowly structured to address the defendants' particularized need.**

Finally, the defendants' request is "structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222. Indeed, they request only those portions of the grand jury transcripts that pertain to the government's legal instructions, guidance, or closing comments. Further, rather than requesting outright disclosure, the defendants are requesting that the Court review the materials *in*

17

*camera* in the first instance to determine whether disclosure to the defense under Rule 6(e)(3)(E)(ii) is warranted. This narrowly tailored request for information targets those grand jury materials that the record suggests may form a ground to dismiss the indictment.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court order the government to provide transcripts of any instructions, legal guidance, or closing comments provided to the grand jury for the Court's *in camera* review and that, should the Court find based on such review that disclosure to the defense is warranted under Rule 6(e)(3)(E)(ii), that the Court order such disclosure.

Respectfully submitted,

/s/ *Jack W. Selden*
Jack W. Selden
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 521-8472
jselden@bradley.com

Gregory G. Marshall (admitted *pro hac vice*)
Erin K. Sullivan
Bradley Arant Boult Cummings LLP
1900 K Street NW, Suite 800
Washington, DC 20006
(202) 393-7150
gmarshall@bradley.com
esullivan@bradley.com

*Counsel for Craig D. Perciavalle*

/s/ *James R. Sturdivant (with permission)*
James R. Sturdivant
Robert R. Baugh
Alyse N. Windsor
Dentons Sirote PC
2311 Highland Avenue South
Birmingham, AL 35205

(205) 930-5100
jim.sturdivant@dentons.com
robert.baugh@dentons.com
alyse.windsor@dentons.com

*Counsel for Joseph A. Runkel*

/s/ *Frederick G. Helmsing, Jr. (with permission)*
Frederick G. Helmsing, Jr.
T. Hart Benton III
Jones Walker, LLP
11 North Water Street, Suite 1200
Mobile, AL 36602
(251) 432-1414
fhelmsing@joneswalker.com
hbenton@joneswalker.com

*Counsel for William O. Adams*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I electronically filed the foregoing joint response with the Clerk of the Court using the Court's CM/ECF system, thereby serving this filing on all attorneys of record in this case.

/s/ *Jack W. Selden*
Jack W. Selden

*Counsel for Craig D. Perciavalle*